**Tarun Makkar Memorandum in Aid of Sentencing**

# Attachment B

(202) 328-7800
(202) 686-2202                                                                              FAX: (202) 686-2208

# ROBERT K. MADSEN, PH.D.
CLINICAL & FORENSIC PSYCHOLOGY
Suite 303
5028 Wisconsin Avenue, N.W.
Washington, D.C. 20016

November 30, 2006

Mr. Habib F. Ilahi
Schertler & Onorato LLP
601 Pennsylvania Ave., NW
North Building, 9th Floor
Washington, D.C. 20004-2601

Re: U.S. v. Tarun Makkar
Cr. No. 06-231(RJL)

Dear Mr. Ilahi:

Since mid October I have been evaluating your client, Mr. Tarun Makkar, a thirty-two year old professional computer programmer temporarily residing in the United States at the behest of his employer. He is a citizen of India currently on his fourth three-month employment stint in this country. Charging documents and discovery material indicate he was apprehending by police when he attempted a personal meeting for sexual purposes with an underage girl, who in fact was a police detective posing as such. You asked for an evaluation into his character and propensities and I was to report back to you by the end of November as to my findings and recommendations. The paragraphs below relate my impressions and beliefs as promised.

**PROCEDURES EMPLOYED**

To date Mr. Makkar and I have met on three occasions, totaling approximately seven hours of direct contact. In the first session I took a brief psychosocial history and I performed an abbreviated mental status examination. I also inquired deeply into his sexual history along with making an enquiry into the instant offense and how he saw himself getting caught up in it. During the next session I had him take three standard psychological tests.[1] I also had him

---

[1] The first was a screening test of personality style called the Eysenck Personality Questionnaire, Revised (EPQ-R). The second test was a measure assessing "normal" personality functioning called the Sixteen Personality Factor Test, Fifth Edition (16PF). The third instrument was a test assessing "abnormal" personality functioning called the Millon Clinical Multiaxial inventory, Third Edition (MCMI-III).

complete a sophisticated test assessing sexual matters.[2] In a final session I discussed with him the complete findings from these four tests. During that session I also explored with him a number of facets of his personality therein revealed, positive and negative. Subsequently, I have also completed a procedure assessing the likelihood of his recidivism; this is called the Sex Offender Risk Appraisal Guide (SORAG). To finish this last procedure I also had to fill out the Hare Psychopathy Checklist, Revised (Hare) which is another assessment (beyond that included in the MSI-II) of any potential psychopathy. The following brief paragraphs relate the more salient findings of my contacts with him and the basis of my conclusions and recommendation that follows.

**IMPORTANT INTERVIEW FINDINGS**

Mr. Tarun Makkar is a thirty-two year old man born in India on July 27, 1974. He is an only child from a deceased father and a mother currently in ill health; he apparently takes care of his mother almost entirely. She is said to have developed a number of ailments, among which are serious blood clots on the brain. She is on many medications and close medical monitoring to prevent recurrent life-threatening episodes. Mr. Makkar is a well-educated man, having an M.S. degree in computer science from a top-notch university in India. He has been continuously employed since attaining his ultimate degree, the last seven years of which has been with Hughes Software Systems that recently was sold to Flextronics Software Systems. His job description is as a Technical Leader. He has four prior three month long employment stints in the United States. These began in April and December 2004, September 2005 and April 2006. Apparently there are no indications of any illegal activity during those times and he claims no history of such at any time in his life.

Mr. Makkar reported he was late in becoming interested in sexual matters, developing his first real interest in the twelfth grade. He noted that no one had ever spoken with him about sex during his life. All of his knowledge has come from talking with friends and the media portrayal he has seen that itself was very limited due to censorship in India. His first sexual contact ever was with his wife when they were married in April 2000; he was age 25 at the time. It was the same for his wife, Rachna, who was 23 at the time. He noted that they have always engaged in missionary position coitus on a frequency of 1-2 times per week, never experimenting with any other kind of sexual contact. I note that both the frequency of sexual contacts as well as the limited variety noted is on the far low end of what would be expected from a couple with this age and educational background.

Mr. Makkar adamantly stated that he had always been faithful to his wife, though occasionally it seemed that some opportunities were there in which he

---

[2] This last instrument is a test designed to assess one's sexual knowledge, sexual attitudes and similarity to groups of known sex offenders, such as child molesters and rapists. That instrument, the Multiphasic Sex Inventory, Revised (MSI-II) was the only measure not scored in my office. It had to be sent to a national clearinghouse for scoring; it was just returned to me.

might have done otherwise. It was notable to me that these always involved Internet connections with <u>adults</u> that he eschewed meeting. I note that in all of this it seemed to me that he was rather naïve about sexual matters, meaning that he was both ignorant about some sexual facts as well as innocent about some of the sexual behaviors often engaged in by others. In any case, he and his wife are the proud parents of a five-year-old girl and Mr. Makkar also is their only support.

     Regarding the instant offense, Mr. Makkar was still in obvious shock with regard to what has since transpired. To his credit he did not try to dodge in any way what he is reported to have done. He showed obvious guilt (not shame) and remorse in both word and demeanor. The most important part of this all was that he was almost clueless as to how it seemed to unfold. He clearly disavowed any *a priori* interest in going to the Internet with a desire to engage someone for sex, let alone with a minor. Yet as it unfolded, he was a willing participant in moving in that direction. He noted in that regard that he was very curious as to what the girl would be like, e.g. what she really looked like and what her real age was. Besides his clear naiveté and curiosity, what was also obvious to me was his loneliness. He said, " I chat because I'm alone and lonely." When I then noted how stupid the whole affair was, he said with halting tears and a downcast head, "I think of it every day! I'm here now, five months in here to think of it." When then queried about why he went to his car to make the meeting he said, "I just didn't think of it. I just wanted to meet someone." He added that when he was told that all of this was a felony, he was shocked, because he believes he had no motive to have underage sex. He noted, however, that he had to admit that he said what he said and did what he did, which is the prerequisite to a guilty plea. He hastened to add, however, "No one that knows me believes that I would do this thing!"

     While none of this history presented to me any significant material suggestive of a mental disorder, it did suggest the type of background often seen in those who are socially and emotionally immature, hence vulnerable to doing things that are ill advised. Let me say in this regard, therefore, that early criminologists first noted in the 1950's that those arrested for various offenses come from four basic groups. The first, perhaps the largest, comprises the psychopaths who care little for another's rights, let alone feelings. The second, another large group, are the so-called sub-cultural criminals who do what they do because that is the only way they see as a possible course to survive; crime for them is just a way of life. A third group, very small in numbers, comprises those who commit offenses due to mental illnesses. Finally, the fourth category, rather small in numbers, deals with those who are naïve and immature; these commit offenses out of ignorance and ineptitude, often falling into things in spite of themselves. Mr. Makkar seems to be from this latter group, and testing data strongly corroborated this conceptualization.

**IMPORTANT TESTING DATA**

On the test of personality style (EPQ-R) Mr. Makkar came across as an individual who is clearly introverted and more emotional than not. These are the two major (far and away most important) personality variables. They are much more inclusive of issues than the simple terms of Extraversion-Introversion and Emotional Stability-Instability suggest. Suffice it to say here that those who are introverted and/or unstable experience much more dysphoric affect, problematic behavior, and dysfunctional cognition than those who are extraverted and/or emotionally stable. Mr. Makkar's scores put him squarely within the 2X2 quadrant summarizing these primary variables that is known to predict those who often develop mental or emotional difficulties. While the majority of such individuals do not progress into such, they are at risk of doing so much more often than others who find their place in the other three quadrants.

Mr. Makkar's summary factor scores from the 16PF corroborated his accurate placement in this quadrant, but his scores on the first-order factors suggested more of a staid naiveté than any diagnosable problem. For example, he tested low to very low on dimensions of Surgency (F-3), Suspiciousness (L-3), Imagination (M-3) and Rebelliousness (Q1-2). These suggest he is rather inhibited around others and far more trusting (naïve) than not. They also suggest that he is lacking in guile and that he is very "traditional" in his outlook on life. High Guilt-proneness (O-8), low average Ego Strength (C-4), and very low Self-sufficiency (Q2-2) round out a picture of someone who is prone to guilt and emotional overload, hence much more dependant on others than not. The test of so called "abnormal" personality functioning picked this up as well.

On the MCMI-III Mr. Makkar did not produce scores suggestive of a major mental disorder. His heightened score on a scale of undue anxiety, however, strongly suggests he is experiencing an Adjustment Disorder with Anxiety (DSM-IV 309.24) due to his current status before the Court. Furthermore, he tested very high on a scale of dependency suggesting as well that he by nature has a Dependent Personality Disorder (DSM-IV 301.6). When one looks at the criteria for this latter diagnosis they reflect precisely the type of threat-sensitivity that the so-called "inept" offender is posited to have. It is instructive, therefore, to look carefully at the type of offense committed and the sexual backdrop upon which these behaviors occurred. The MSI-II did just that.

On the MSI-II Mr. Makkar produced a number of scores that suggest he is <u>not</u> a typical offender. For example, his Conduct Disorder Index and Sociopathy Index were uniformly very low or absent entirely. More importantly, the static variable measure that has been seen to predict offenses (Problematic History Index) fell way short of that seen with offenders.[3] Hence, Mr. Makkar does <u>not</u> seem to be someone who fits into the large offender categories of either psychopaths or sub-

---

[3] A score of 16 or more on this scale of 30 items has been found to predict those who offend. His score was 4!

cultural offenders. On a scale of Sex Knowledge and Beliefs, however, his score of 8 (from a possible total of 24) suggests he has a woefully inadequate amount of sexual information, i.e. about sexual anatomy and physiology. And while all of the individual sex deviance scales are virtually absent any indication of known patterns of particular deviant interests, his response to a few of the dynamic questions revealed some attributes similar to those of known sex offenders, even though the behavioral scales do not show any behavioral propensities toward acting-out. Thus the MSI-II does not show him to be an offender at risk for a re-offense, though it revealed on one of many scales an instance of some likely unconscious deviant interest. The Sex Offender Risk Appraisal Guide (SORAG), like the MSI-II scales noted above, also verified that behavioral expression of any deviance is not likely.[4]

The SORAG is a static measure of one's propensity to re-offend once one is released into the community from confinement for having committed a sex offense. Even using the most stringent criteria possible on Mr. Makkar's data set, he still only emerges with a 7% chance of re-offense within 7 years and a 9% chance within 10 years of release. This is very much in line with the MSI-II's indication that he does not show any real propensity on static variables of offending further. Moreover, it should be added that in order to perform a SORAG evaluation one also needs to run an individual through the criteria of the Hare Psychopathy Checklist, Revised (Hare). On that measure Mr. Makkar also emerges in the lowest possible category thereby showing no indication of any psychopathic tendencies, just as the MSI-II also showed. Hence, the data from testing on Mr. Makkar clearly and definitively show he is virtually without any realistic risk for re-offending.

**ANALYSIS & SUMMARY**

The composite of the data obtained from testing and interviews suggest that Mr. Makkar's offense was mostly the product of his socially backward style and even ignorance and naiveté. It is easy to see than when he was thousands of miles from family and feeling very lonely, he could seek out companionship on the Internet. The fact that motive morphed into sexual talk and eventual plans to meet seems very much in line with the so-called "inept" offender category referenced above. It cannot be said too strongly, therefore, that he does not appear to be the type of predatory villain that the government's sting operation was primarily designed to ensnare. Rather, he seems to be the klutz that stumbled into doing something that he has some interest in, but would, under most all circumstance, rarely, if ever, do. His lack of any real psychopathic or paraphilic background says much good about him, as does the fact that two sets of static variables do not

---

[4] A more complete description of this instrument than given above is that it was developed in Ontario, Canada from a decades long study with a population of mentally disordered offenders, sex offenders, fire setters, and psychopathic offenders. Using mostly demographic data collected from such individuals, the authors constructed risk appraisal guides predictive of future violent and/or sexual offenses. The SORAG produces nine categories of predictive risk depending upon the score one achieves. The re-offense probabilities for those nine categories range from .07 to 1.0 (7% to 100%) within two periods, one a seven-year range after release and the other a ten-year period post release from confinement.

suggest he is at any real appreciable risk of re-offense. Moreover, to his credit, obviously contributed to by the instant offense and the consequences laced therein, Mr. Makkar has recoiled at his poor judgment. His avowed intention to stay clear of any recurrence only bolsters the static data that suggests he would not likely repeat in any case.

With the above in mind, I do not believe that Mr. Makkar would benefit from any incarceration, if the purpose for such were to provide to him any additional incentive to avoid behaviors such as those that led to his arrest. The probability of him re-offending is too low in the first place for there to be any appreciable decrease achieved by such a method. I can say on the other hand, however, that his nearly six-month stint in jail has caused him great emotional stress to date, leading to a diagnosable DSM-IV Adjustment Disorder. Obviously, further incarceration will only continue, if not exacerbate this. Moreover, it is clear that his wife, five-year-old daughter, and ailing mother are likely to bear a significant burden for any further incarceration he must complete. I wonder, therefore, if expediting his deportation (with blacklisting to prevent further entry at any time) might be the more humane and equitable outcome for this particular crime. I only offer such an opinion in this particular case because of the unique set of circumstances involving him, his family, and the "victim" involved. Balancing all of the competing variables here involves justice in the fullest context of what that term means. I trust that these presents aid in the Court's determination of such.

Please feel free to contact me for any clarification of the above.

Sincerely,

Robert K. Madsen, Ph.D.